**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **FRANCIS PAXTEN PRUITT,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO. 13-00640-KD-M** |
| **DEPUTY KRISTEN GILLESPIE,** | ) | |
| **individually,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (Docs. 17-20), Plaintiff's Response (Docs. 25, 27-28) and Defendant's Reply (Doc. 30).

**I.     Factual Background**[1]

Plaintiff Francis Paxten Pruitt (Pruitt), initiated this action under 42 U.S.C. § 1983 alleging three (3) federal claims against Defendant Deputy Kristen Gillespie (Gillespie), in her individual capacity, for violations of his Fourth Amendment rights due to: 1) false arrest; 2) malicious prosecution; and 3) business invasion/unlawful search of a business.  (Doc. 1).

Pruitt operated a check cashing business in a room connected to Buck's Country Store (Buck's), a convenience store/gas station in Mobile County, Mobile, Alabama.    (Doc. 19-1 (Dep. Pruitt at 19, 21-24)).  Pruitt's business had a separate entrance and operated completely separately from Buck's.  (Id.)  Pruitt had a business arrangement with Buck's through which he rented the front room and paid them a percentage of his net every month.  (Id. at 19-20).

---

1 On summary judgment, the Court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004).

Gillespie was a Deputy Sheriff with the Mobile County Sheriff's Office, a Corporal, and a Detective in the White Collar Crimes Unit.  (Doc. 19-2 at 2 (Aff. Gillespie)).

This litigation stems from Pruitt and Gillespie's December 30, 2011 interaction.  On that day, Pruitt tried to effect a citizen's arrest against an individual he believed was passing fraudulent checks at his business.  As a result, Pruitt was arrested by Gillespie for unlawful imprisonment and menacing, which was later upgraded to robbery in the first degree.

Specifically, on December 29, 2011, Buck's employee Kenyetta Gilmore McCarty (McCarty)[2] cashed two (2) Whitney Bank checks for an individual named Roderick Jones (Jones) for $2,300.  (Doc. 19-2 at 14 (McCarty's Witness Statement)).  The next day, December 30, 2011, Pruitt – after conferring with McCarty -- cashed four (4) Whitney Bank checks for three (3) individuals who were accompanied by Jones.  (Id.)[3]  After they left the store, Pruitt called the bank number on the checks provided, learned they did not belong to Whitney Bank, and looked on-line and saw that there was not a Whitney Bank at the address on the checks.  (Id.)  From this, Pruitt concluded the checks were forgeries.  (Id.)  Pruitt asked McCarty how she knew the individuals; she explained that she had cashed Jones' check the prior day and had Jones' number. McCarty called Jones asking him to return to the store, telling him that her car needed to be jumped (which was true).  (Doc. 19-2 at 14 (McCarty's Witness Statement)).[4]  Pruitt admits that he "lured" Jones back to the store.  (Doc. 27 at 5).

After Jones arrived, Pruitt entered Buck's, where Buck's employees McCarty and Maletta Monigan (Monigan) had been working, and at that point, Pruitt's "Glock was out and

---

2 When she assisted Pruitt, she worked as an independent contractor for his check cashing business (while she worked for the store, she helped Pruitt sometimes as needed).  (Doc. 19-1 (Dep. Pruitt at 22-26)).

3  Doc. 28-2 at 3-5; Doc. 28-5.

4  McCarty also had plans to go on a date with Jones that evening.  (Id.)

pointed down at arm's length as [he]…went in the door." (Doc. 19-1 (Dep. Pruitt at 92)).[5] McCarty and Jones were in the back left corner of Buck's, so Pruitt called out to Jones and said "we need to talk." (Id. (Dep. Pruitt at 93)). Jones approached Pruitt, who was standing in front of the Buck's front door. (Id.) Jones "came charging around the aisles" towards Pruitt "but stopped when he got about six feet from where I stood." (Id. (Dep. Pruitt at 94-95)). Pruitt told Jones "those checks we cashed…and those girls were no good." (Id. (Dep. Pruitt at 95)). Jones responded that he did not cash any checks and Pruitt told him he did and that he had vouched for the girls. (Id.) Jones repeated that he did not cash any checks. (Doc. 19-1 (Dep. Pruitt at 95)). Pruitt then yelled at McCarty and Monigan to call 911. (Id.)

Jones then "basically confessed. He said, okay, man, like, yeah, I cashed those checks here[]" and then asked to go out to his truck to retrieve his phone. (Id. (Dep. Pruitt at 102)). Pruitt told Jones he "wasn't going anywhere. He had stolen from me and he wasn't going anywhere." (Id.) Pruitt told Jones there were six (6) checks totaling over $6,500 plus whatever the total was from that evening at issue, stating: "this was way serious. I was upset and shaking. I didn't like being put through all of this. He [Jones] got down on his knees [on all fours] saying calm down and let's talk." (Id. (Dep. Pruitt at 103)). Jones said he needed to make a call and Pruitt told Monigan to retrieve Jones' phone from his truck. (Id. (Dep. Pruitt at 104)). Monigan then handed the phone to Jones and he called someone stating they "needed to get the money back together and bring it up to the store." (Doc. 19-1 (Dep. Pruitt at 106)).

---

5 McCarty reported that Pruitt had a gun in his hand but did not point it up at Jones. (Doc. 19-2 at 14 (McCarty's Witness Statement)).

At the time, Pruitt had not heard from the bank and had not yet been informed that Jones' checks were, in fact, fraudulent or "no good," that was only confirmed after the December 30th incident and after Pruitt's arrest.  (Id. (Dep. Pruitt at 115-116)).

Gillespie was dispatched, along with another detective Clifton Holifield (Holifield), to Buck's after being told a suspect was trying to cash a bad check at the business.  (Doc. 19-2 at 2 (Aff. Gillespie)).  When they arrived, there were already several officers on site and Gillespie was told they had been dispatched for "a call that a robbery was occurring with a black male dressed in all black who had entered the store armed with a gun."  (Id.) According to Gillespie:

> The Mobile County Sheriffs Deputies told me that the call was made by a female clerk at the convenience store.  They advised that when they arrived there was no robbery in progress and that the owner of a check cashing business located at the store, later identified as Francis Paxton Pruitt was holding at gun point a black male suspect of attempting to pass a bad check.  The Deputies advised me that when they arrived on the scene they observed on the scene they observed  Mr. Pruitt holding a black firearm in his right hand down by his side. They also advised that the black male suspect, later identified  as Roderick  Jones, was not armed with any weapon or gun.
>
> After speaking with the Deputies Sheriffs on site I along with Det. Holifield interviewed Mr. Jones, Mr. Pruitt and two (2) females at the scene.
>
> Based upon our investigation we determined that Mr. Jones had not attempted to rob the store or Mr. Pruitt or any other party at the scene and further, the Jones had not come to the business and attempted to pass a bad check.
>
> Roderick Jones stated that one of the females, Kenyetta Gilmore, who was later identified as a clerk at the store, called Mr. Jones claiming she had car trouble and asking for his help.  When he arrived at the store he went inside and spoke with Ms. Gilmore.  He stated that while he was at the back of the store a white male (Mr. Pruitt) came from somewhere in the store and pointed a handgun at him and began yelling at him to retrieve his, Mr. Pruitt's, Eight Thousand Dollars ($8,000.00) that Pruitt claimed to get three (3) females who had cashed checks at the business earlier to come to the store and to bring his Eight Thousand Dollars ($8,000.00) or else he, Mr. Jones, was going to die. Jones said that Pruitt pointed a gun at him demanding  his money and told him that he, Mr. Jones, was going to leave the store dead or in jail.  Jones further stated that Pruitt would not let him leave the store to make a phone call.

Jones told me and Det. Holifield that Pruitt had pointed a gun at him until the Deputies arrived on the scene and that he believed that Pruitt was going to kill him and that he, Mr. Jones, was in fear for his life….

We also interviewed Mayetta Monigan.  Monigan told us that Pruitt had yelled for her to call 911 stating that he was about to be robbed.  She told us that she was on the phone with Pruitt while he was waiting outside behind the rear of the business. He said that Pruitt advised her to tell him when Jones was finished looking at the car and was inside the store.

Monigan told us that Gilmore and Jones entered the business, she advised Pruitt that Jones was inside the business and that Pruitt then came in the business.

She told us that she heard Pruitt yelling at Jones for Jones to give him, Mr. Pruitt, his Eight Thousand Dollars ($8,000.00).  She said that she saw Pruitt with a black handgun in his hand at that Pruitt would not let Jones leave the store.

She told us that Pruitt pointed the handgun at Jones stating for him to give him his "fuckin money".  She stated that she went outside and retrieved Jones' cell phone and that Jones attempted to call someone while Pruitt continued to yell at him. ...

We also interviewed  Kenyetta Gilmore. Gilmore told us that she had been contacted by Pruitt that day and advised that Pruitt had cashed some checks for some females who were introduced to him by Mr. Jones.

She advised us that Pruitt had asked her to contact Jones and see if she could convince him to return to the store so he could get his money back.  She told us she did contact Jones and asked him to come back to the store because she needed her vehicle jumped off.

She told us that Pruitt was waiting outside in the rear of the business for Jones to arrive. She said that once she entered the store Pruitt came inside and began yelling at Jones about his money.  She confirmed that Pruitt had a handgun in his hand but she stated that she did not see Pruitt point the gun at Jones.

She also confirmed that Pruitt had told her and the other clerk to call 911 and to say that he was about to be robbed.  She said that during the entire time Pruitt had a gun in his hand and was continuously yelling at Jones….

We also interviewed  Mr. Pruitt.  Based upon his answers I did not believe that he gave direct answers and further, that he gave inconsistent statements about the events that occurred. Pruitt advised us that he thought Jones had cashed some counterfeit  checks  but when asked he stated that he had not heard back from the bank at that time as to whether the checks were worthless.

He told us that it was Ms. Gilmore who made the suggestion to lure Jones back to the business. He told us that the reason he moved his truck to the back of the store was that he had money in the truck. He also told us that Jones had come charging toward him.

After collecting the information from the other Deputies and people on the scene I contacted one of my Superiors, Lt. Paul Burch, and advised him of what I had learned. After conferring with Lt. Burch I placed Pruitt under arrest for unlawful imprisonment and menacing.

I then called the on-call District Attorney, Nicki Patterson, and after advising her of the facts I have set out above, she advised to change the charge to robbery 1st degree.

***

(Doc. 19-2 at 3-6 (Aff. Gillespie)).

Pruitt's version of December 30, 2011 is as follows:

I never told Jones to get me my money or I would shoot him. I told Jones in (so many words) that we had called the police and we would wait for them and the police were on their way.

I never told Jones he was going to die.

Gilmore cashed 6 bogus checks (including 2 from Mr. Jones) on December 29, 2011. I deposited the checks and saw that they were listed as Knights True Craftsman Payroll checks. I cashed more 4 bogus checks (Knights True Craftsman) on December 30, 2011 and realized that the checks were from the same people and banks.

Based on my telling Monigan or Gilmore or both of them to call the police, they arrived before Gillespie and had Mr. Jones in handcuffs and were preparing to take him to town when Gillespie showed up.

I held Jones with a gun at my side and told Jones he could not leave the store.

I advised the police that I believed that Jones had cashed some counterfeit checks along with the others and I got Jones back to my shop (he had just left) in order to arrest him.

The police who arrived before Gillespie arrived, arrested Mr. Jones on my statement, their search of Jones' truck and on the bogus checks that I gave them and more bogus checks they got out of Jones' truck (according to the police). They had him in cuffs when Gillespie arrived on the scene.

On December 30, 2011, I was cashing checks at my office in Bucks Country Store, when about 6:30 PM three females and Jones came in wanting to cash four checks on

6

Knights True Craftsman. These were the same kind of checks on Whitney Bank that I had seen just the night before when I was making the deposit to Capstone Bank. Kenyetta (Gilmore) happened to be in the store when the three girls and Jones came in. I called over to Kenyetta in the store and asked if we had cashed these checks before and if they were good. She said yes, and the guy in the store (that I later learned was **Roderick Jones)** spoke up saying these girls were fire watches working with him up at TK for Knights Marine. As I cashed the checks for the girls, I became suspicious based on their appearance and their coy conversation with me. Right after the [sic] left, I asked if someone in the store could get their car license number. Donna Vickers a co-worker of Kenyetta's at her morning job went out to get it, but she came back in saying they were driving off as she went out the door. I had the girls call 911 when Jones came back.

Four of the bogus checks were given to the officers that arrested Mr. Roderick Jones when they arrived. Gillespie let Mr. Jones go and instead arrested me for menacing and banishing a weapon (or something like that, emphasis added) which was then dropped and ungraded to robbery, which was then no-billed by the grand jury.

I was arrested by warrant instigated by Gillespie for robbery.

(Doc. 28-3 at 2-3 (Decltn. Pruitt)).

Thus, the parties dispute how Pruitt was displaying his Glock firearm, whether he threatened Jones' life, how he communicated with Jones during the incident, and a few other items. For reasons explained below, these factual disputes, however, are not dispositive to the issues in this case because the facts, for purposes of summary judgment, are taken in the light most favorable to Pruitt and even when doing so, do not support his claims as a matter of law.

Regarding the arrest, Gillespie contacted one of the Officers in her chain of command, Lt. Paul Burch and advised him of the situation. (Doc. 19-2 (Aff. Gillespie)). After conferring with Lt. Burch, and after conducting an interview with Pruitt, on December 30, 2011, she placed Pruitt under arrest for unlawful imprisonment and menacing. (Id.) (Doc. 30-1 (Transcript of Police Interview)). At some point later, Gillespie contacted the on-call District Attorney and was advised to charge Pruitt with robbery instead. (Doc. 19-2 (Aff. Gillespie)).

On January 4, 2012, Gillespie returned to the business to retrieve video footage from that night.  (Doc. 19-2 (Aff. Gillespie)).  The video cameras were not owned by Pruitt but instead were the property of Buck's.  (Doc. 19-1 (Dep. Pruitt at 25-29)).  The video monitors from which Gillespie obtained copies of the videos were located not in the check cashing business but in the Buck's.  (Id.)  Gillespie took a photograph of some names and phone numbers which were on a refrigerator located in the Buck's office.  (Doc. 19-2 (Aff. Gillespie)).  The store clerks gave consent for Gillespie to review the video tape and make copies of the film related to the incident in question. (Id.)

On January 9, 2012, *after Pruitt had been arrested for unlawful imprisonment and menacing*, a warrant was issued for Pruitt for robbery in the first degree.  (Doc. 28-4 at 2).  Also on this date, a complaint was filed against Pruitt in the District Court of Mobile County for robbery in the first degree.  (Id. at 3). Pruitt waived his preliminary hearing and the robbery in the first degree charge against him was bound over to the Grand Jury.  (Doc. 19-1 (Dep. Pruitt at 127-131)).  Jones failed to appear at the Grand Jury and in September 2013, the Grand Jury "no-billed" the robbery charge against Pruitt.  (Doc. 19-2 (Aff. Gillespie)).

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a) (Dec. 2010). The recently amended Rule 56(c) provides as follows:

> ***(1) Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

8

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

***(2) Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

***(3) Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

***(4) Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).  Defendant, as the party seeking summary judgment, bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter…the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

On summary judgment, the Court must take the facts in the light most favorable to Pruitt. Indeed, with specific respect to the resolution of a summary judgment motion based on qualified immunity – as is the case here --  the Eleventh Circuit has declared:

> …we approach the facts from the plaintiff's perspective because "[t]he issues appealed here concern not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law." Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir. 1998). As this Court has repeatedly stressed, the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000). Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff….

McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009).

## III.   Section 1983

 To establish Section 1983 individual liability, a plaintiff must demonstrate that: 1) he was deprived of a right secured by the United States Constitution, and 2) the act or omission causing the deprivation was committed by an individual acting under color of state law. Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir. 1987).  However, qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities.  Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003). The doctrine offers complete protection for government officials so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Once an official demonstrates that he was performing a discretionary function, the burden is on the plaintiff to prove that qualified immunity does not insulate the official from liability. Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir.2004).    In determining

10

whether an officer is entitled to qualified immunity, and as explained in <u>Smith v. City of Montgomery</u>, 2011 WL 5216309 *5-6 (M.D. Ala. Nov. 2, 2011), courts consider the following:

> "….government officials performing discretionary functions generally are shielded from liability for civil damages" unless they have violated a clearly established constitutional right. <u>Townsend v. Jefferson Cnty</u>., 601 F.3d 1152, 1157 (11th Cir.2010) (citation and internal quotation marks omitted). A qualified immunity determination requires the application of a multi-part test. First, a defendant must establish that he or she was acting within his or her discretionary authority as a public employee when the conduct in question occurred. Id. at 1158. Next, a plaintiff must demonstrate "'that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.'"…
>
> In previous years, this two-step inquiry had to be conducted in order. That is, the court had to decide whether a right existed (and whether it was violated) before deciding whether it was clearly established. Now, courts may "'exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'"….

The parties do not dispute that Gillespie was engaged in a discretionary function when she made the arrest in this case.  Thus, Pruitt bears the burden of proving that Gillespie does not enjoy qualified immunity protection.

## A.   <u>False Arrest</u>

Gillespie effected a warrantless arrest of Pruitt for unlawful imprisonment and menacing, and upon contacting the DA, the charge was later changed to robbery in the first degree.  Pruitt contends that he suffered a false arrest in violation of the Fourth Amendment because he was attempting a citizen's arrest and thus there was no probable cause to arrest him for any offense.

The Fourth Amendment protects citizens "against unreasonable searches and seizures" by police officers.  <u>Brown v. City of Huntsville</u>, 608 F.3d 724, 734 n. 15 (11th Cir. 2010).  <u>See</u> <u>also</u> U.S. Const. amend. IV.  An arrest is a "seizure" under the Fourth Amendment.  <u>Case v. Eslinger</u>, 555 F.3d 1317, 1326 (11th Cir. 2009) (quoting <u>Skop v. City of Atlanta, Ga.</u>, 485 F.3d 1130, 1137

(11th Cir. 2007)).  "The 'reasonableness' of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause." Id. (citing Skop, 485 F.3d at 1137).

A warrantless arrest without probable cause violates the Fourth Amendment and constitutes a basis for a Section 1983 claim.  Case, 555 F.3d at 1324-1325; Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997).  However, the existence of probable cause at the time of such arrest bars a Section 1983 action for false arrest.  Id.  "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed."  United States v. Jimenez, 780 F.2d 975, 978 (11th Cir. 1986) (internal quotation marks and citations omitted).  "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."  Adams v. Williams, 407 U.S. 143, 149 (1972).  It requires "more than mere suspicious, but does not require convincing proof."  Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998).  The "analysis is undertaken in light of the totality of the circumstances, and the standard 'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.'"  Smith v. Sheriff, Clay Cty., Fla., 506 Fed. Appx. 894, 899 (11th Cir. 2013).  Further, "[w]hile an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity."  Skop, 485 F.3d at 1137.

Even if the officer lacks probable cause, she is still entitled to immunity if she had *arguable* probable cause to arrest.  Hendricks v. Sheriff, Collier Cty., Fla., 492 Fed. Appx. 90, 93 (11th Cir. 2012); Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003).  Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same

knowledge as the [d]efendants could have believed that probable cause existed to arrest [the][p]laintiff ....."  Kingsland v. City of Miami, Fla., 382 F.3d 1220, 1232 (11th Cir. 2004).  The plaintiff bears the burden to "demonstrate that no reasonable officer could have found probable cause under the totality of the circumstances."  Id. Whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern.  Skop, 485 F.3d at 1137–1138.  Such does not require an arresting officer to establish every element of a crime before making an arrest, as that "would negate the concept of probable cause and transform arresting officers into prosecutors."  Scarbrough v. Myles, 245 F.3d 1299, 1303 (11th Cir. 2001).  The inquiry is "whether [the defendant] violated clearly established law in making the arrests based on the objective factors that gave rise to his probable-cause determination and not whether the arrestees' actions actually constituted a crime."  Id. at 1303 at n. 8.  As a result "even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity[,]" Holmes, 321 F.3d at 1079, and "[o]fficers have arguable probable cause even when every element of a crime cannot be proven[,]" Hendricks, 492 Fed. Appx. at 93.

Moreover, qualified immunity will protect officers who make good faith mistakes.  Post v. City of Ft. Lauderdale, Fla., 7 F.3d 1552, 1558 (11th Cir. 1993) (granting qualified immunity on the basis of arguable probable cause where the officers erroneously counted people in excess of a restaurant's maximum capacity), *modified*, 14 F.3d 583 (11th Cir. 1994).  However, it will not protect officers whose conduct "creates factual issues as to their honesty and credibility." Kingsland, 382 F.3d at 1233.  See also Holmes, 321 F.3d at 1083-1084 (reversing the grant of qualified immunity as factual questions existed).

At the outset, Gillespie did not actually witness the actions and crimes for which she arrested Pruitt (*i.e.*, the crimes did not occur in her presence).   Rather, Gillespie arrested Pruitt without a warrant *after* all the activity had ceased between Pruitt and Jones, and Jones had been placed in handcuffs courtesy of other officers who had arrived on the scene first.   (Doc. 28-3 at 2-3 (Decltn. Pruitt)). The initial two (2) crimes Pruitt was charged with, menacing and unlawful imprisonment, are misdemeanors under Alabama law.   According to <u>Bell v. City of York, Ala.</u>, 2013 WL 1352022, *4 (N.D. Ala. Mar. 29, 2013), "Alabama prohibits its police officers from arresting an individual for a misdemeanor offense without a warrant unless the offense is committed in the officer's presence. *See* Ala.Code § 15–10–3(a), Ala. R.Crim. P. 4.1(a)(1)." *However*, "[t]he Eleventh Circuit has rejected [the]…argument that a warrantless arrest for a misdemeanor not committed in the presence of the officer, in violation of Alabama law, violates the arrestee's Fourth Amendment right to be free from unreasonable seizure when the officer has probable cause. *See Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004)(citing, *inter alia, Knight v. Jacobson*, 300 F.3d 1272, 1275–76 (11th Cir.2002)… An arrest which is supported by probable cause—even if not permitted under state law—does not violate the Fourth Amendment. *Knight*, 300 F.3d at 1276." <u>Id</u>. at 6.   Thus, to the extent Pruitt asserts that Gillespie's presence was required for his misdemeanor arrests and her absence impacts the probable cause determination, such is not the case in the Eleventh Circuit.

Turning to the arrest, Pruitt was initially charged with unlawful imprisonment and menacing, which was subsequently changed to robbery in the first degree.   The validity of Pruitt's arrest does not turn on the specific charge announced by Gillespie at the time she effected the arrest because an officer's "subjective reliance on an offense for which no probable cause exists" does not make an arrest faulty where there is actually probable cause to support

some *other* offense.  Lee v. Ferraro, 284 F.3d 1188, 1196 (11th Cir. 2002).  As such, the issue is whether there existed probable cause (including *arguable*) for Pruitt's arrest for any of the offenses -- unlawful imprisonment, menacing, *or* robbery in the first degree.

As to unlawful imprisonment, Ala. Code § 13A-6-42 and 13A-6-41 provide that a person commits this crime in the second degree if he restrains another person, and in the first degree if he restrains another person under circumstances which expose the latter to a risk of serious physical injury.  Concerning menacing, Ala. Code § 13A-6-23(a) provides that a person commits this crime if, by physical action, he intentionally places or attempts to place another person in fear of imminent serious physical injury.

Based on the information contained in Gillespie's Affidavit (Doc. 19-2) (detailing what she observed, what she learned after interviewing witnesses on the scene, etc.) which pertinent parts are substantiated by Pruitt (Pruitt explains that he stood "[b]etween him [Jones] and the door where he would have to go by me to get out[]" and "I told him he wasn't going anywhere[]" – all while holding his Glock firearm by his side (Doc. 19-1 at 21, 24 (Dep. Pruitt at 93, 102))), there is no question that arguable probable cause existed to support an arrest for menacing and unlawful imprisonment.  Even Pruitt's version indicates that Jones feared for his life: "[Jones] got down on his knees saying calm down and let's talk."  (Doc. 19-1 at 25 (Dep. Pruitt at 103)).

In sum, the facts viewed in the light most favorable to Pruitt reveal that: 1) he lured Jones to the store, restrained Jones while showing a Glock firearm, and did so under circumstances which exposed Jones to a risk of serious physical injury (being shot or killed); and 2) he took physical action by blocking Jones' path to exit the store and by holding a Glock firearm at his side, telling him he "wasn't going anywhere," to either intentionally place or attempt to place Jones in fear of imminent serious physical injury (being shot or killed).  See, e.g., Bash v.

Patrick, 608 F. Supp. 2d 1285, 1301-1302 (M.D. Ala. 2009) (discussing that the facts supported a finding of menacing and that the offices had probable cause to swear out a warrant for same). As such, under the totality of the circumstances, as well as Pruitt's silence on the matter, the Court finds that the facts within the collective knowledge of the law enforcement officials were sufficient to cause a person of reasonable caution to believe that these crimes had been committed such that there was, *at a minimum*, arguable probable cause to arrest Pruitt for menacing and unlawful imprisonment.

With regard to robbery, Ala. Code Section 13A-8-41 provides that a person commits the crime of robbery in the first degree if he violates Section 13A-8-43 (robbery in the third degree) and is armed with a deadly weapon or dangerous instrument, or causes serious physical injury to another.  On summary judgment the parties dispute whether Pruitt violated Section 13A-8-43, robbery in the third degree, as follows: whether in the course of committing a theft, Pruitt used force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or threatened the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property.  However, that dispute is irrelevant under the facts of this case.

As explained *supra*, at a minimum, arguable probable cause existed to arrest Pruitt for unlawful imprisonment and menacing, and thus, his arrest was valid *even if* probable cause was lacking for robbery in the first degree, for which he was subsequently arrested.  "[S]o long as probable cause existed to arrest Plaintiff for any offense, the arrest and detention are valid even if probable cause was lacking as to some offenses, or even all announced charges."  Whittington v. Town of Surfside, 490 F.Supp.2d 1239, 1251 (S.D. Fla. 2007).  "The claim for false arrest does not cast its primary focus on the validity of each individual charge; instead we focus on the

16

validity of the arrest. If there is probable cause for any of the charges made ... then the arrest was supported by probable cause, and the claim for false arrest fails." Stachel v. City of Cape Canaveral, 51 F.Supp.2d 1326, 1331 (M.D. Fla. 1999). See also United States v. Harris, 2013 WL 3339055, *6 at n. 19 (N.D. Fla. Jul. 2, 2013):

> [t]he fact that the Defendant was cited for the violation of a different statute is of no consequence so long as there was probable cause to believe the defendant committed a statutory violation of some sort. See, e.g., Owaki v. City of Miami, 491 F.Supp.2d 1140, 1155 (S.D. Fla. 2007) ("Nor does Plaintiff's arrest become a violation of his constitutional rights because ultimately he was charged with a different crime than the one he was arrested for: '[t]hat a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence in determining the validity of the arrest itself[]'").

See also United States v. Saunders, 476 F.2d 5, 7-8 (5th Cir. 1973) (when an officer makes an arrest properly supported by probable cause, to arrest *for a certain offense*, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest). In sum, if the arresting officer had arguable probable cause to arrest *for any offense*, qualified immunity will apply. Grider v. City of Auburn, Ala., 618 F.3d 1240, 1257 (11th Cir. 2010); Burnett v. Unified Govt. of Athens-Clarke Cty., Ga., 395 Fed. Appx. 567, 569 (11th Cir. 2010) (same).

Moreover, "[d]ropped charges provide an occasion to puncture, through retrospection, the onerous on-scene judgments of an officer. The ultimate release of charges... is of no significance in the probable cause analysis. Officers are not expected to be legal technicians." Arrington v. Kinsey, 512 Fed. Appx. 956, 959 (11th Cir. 2013). The fact that an arrested individual is ultimately acquitted, or charges against him are dropped, is of no consequence in determining the validity of the arrest. Marx v. Gumbinner, 905 F.2d 1503, 1507 (11th Cir. 1990); Mills v. Town of Davie, 48 F.Supp.2d 1378, 1380 (S.D. Fla. 1999).

17

Given the foregoing and under the totality of the circumstances, Pruitt has failed to prove that a reasonable officer possessing the same knowledge as Gillespie could not have believed that arguable probable cause existed to arrest him for some of the offenses discussed above. Thus, Pruitt's Section 1983 false arrest claim fails because Gillespie is entitled to qualified immunity.  As such, Gillespie's motion for summary judgment on this claim is **GRANTED.**

## B.  <u>Malicious Prosecution</u>

In Section 1983 actions, government officials are immune for actions taken in their discretionary capacity unless the actions violated law that was clearly established at the time. <u>Wilkerson v. Seymour</u>, 736 F.3d 974, 977 (11th Cir. 2013).  To be entitled to qualified immunity from a Section 1983 malicious-prosecution claim, an officer need only have arguable probable cause.  <u>Grider</u>, 618 F.3d at 1257 and n. 25; <u>Searbrough v. Miles</u>, 245 F.3d 1299, 1303 (11th Cir. 2001) (same).  To establish a Section 1983 malicious prosecution claim, a plaintiff must prove: 1) the elements of the common law tort of malicious prosecution; and 2) a violation of his Fourth Amendment right to be free from unreasonable seizures.  <u>Id</u>. at 1256.  The elements of the common law tort of malicious prosecution are: 1) a criminal prosecution instituted or continued by the present defendant; 2) with malice and without probable cause; 3) that terminated in the plaintiff accused's favor; and 4) caused damage to the plaintiff accused.  <u>Id</u>.  "The existence of probable cause ... constitutes an absolute bar" to federal malicious prosecution claims.  <u>Arrington v. Kinsey</u>, 512 Fed. Appx. 956, 958 (11th Cir. 2013). <u>See Grider</u>, 618 F.3d at 1257 n. 25 ("We ... use the same 'arguable probable cause' standard in the qualified immunity context for § 1983 claims for both false arrest and malicious prosecution, as both require a violation of the Fourth Amendment[]").  Moreover, dismissal of the charges by a court does not necessarily signify a lack of probable cause.  <u>Id</u>. at 960.

18

As detailed *supra*, at a minimum, arguable probable cause existed for some of the offenses for which Pruitt was arrested. Because Gillespie had arguable probable cause to effect Pruitt's arrest, his claim for malicious prosecution fails as a matter of law and Gillespie is shielded by immunity. See, e.g., Jeter v. Duren, 2012 WL 1079877, *9 (N.D. Fla. Feb. 23, 2012) (finding similarly). As such, Gillespie's motion on this claim is **GRANTED.**

**C.      Unlawful Search**

Pruitt alleges that Gillespie violated his Fourth Amendment rights because she invaded *his* business interests and conducted an unlawful/illegal search of his check cashing business. (Doc. 1). This claim is based on the fact that after Pruitt's arrest, Gillespie returned to the Buck's and searched an office inside *that* store – *but not Pruitt's check cashing business attached thereto* -- as well as viewed security video from, made copies of videos from, and took a photograph of some documents on a refrigerator in, *that* store. (Doc. 19-2 at 6 (Aff. Gilespie); Doc. 19-1 (Dep. Pruitt at 18, 28-29)).

For a person to assert a violation of the Fourth Amendment, the person must establish a legitimate expectation of privacy in the place or object being searched. Rakas v. Illinois, 439 U.S. 128, 148–149 (1978) ("[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed[]"). Fourth Amendment rights are personal and cannot be vicariously asserted. Id. at 133–134. See also Lenz v. Winburn, 51 F.3d 1540, 1549 (11th Cir. 1995) (same). To have standing to challenge a search, a person "must manifest a subjective expectation of privacy in the invaded area that 'society is prepared to recognize as reasonable.'" United States v. Moncur, 2011 WL 3844096, *4 (S.D. Fla. Jul. 28, 2011). Moreover, [p]roperty used for commercial purposes is treated differently for

Fourth Amendment purposes from residential property." <u>Minnesota v. Carter</u>, 525 U.S. 83, 90 (1998); <u>New York v. Burger</u>, 482 U.S. 691, 700 (1987) ("An expectation of privacy in commercial premises ... is … less than, a similar expectation in an individual's home[]"). While individuals may still have a "reasonable expectation of privacy against intrusions by police" into a particular commercial space, <u>id.</u>, or their office, <u>O'Connor v. Ortega</u>, 480 U.S. 709, 716 (1987),[6] the "great variety of work environments" requires analysis of reasonable expectations "on a case-by-case basis." <u>Id.</u> at 718.[7] Further, the individual challenging the search bears the burden of proving standing. <u>United States v. Harris</u>, 526 F.3d 1334, 1338 (11th Cir. 2008).

Pruitt's unlawful search claim fails because he has failed to establish standing. Pruitt is not the owner of Buck's, nor does he hold any property interest in Buck's offices. Pruitt cannot assert a Fourth Amendment violation claim vicariously, or for another (on Buck's behalf). Additionally, on summary judgment, Pruitt asserts no legitimate expectation of privacy in Buck's. Rather, Pruitt is wholly silent as to this claim in response to Gillespie's motion and only asks that this Court deny summary judgment "as to the false arrest claim and the malicious prosecution claim[]" (Doc. 27 at 25). Further, Gillespie did not even search Pruitt's commercial space/office that he was renting (his check cashing business), but rather the interior of Buck's itself and namely, one room. Accordingly, because Pruitt has failed to allege or establish

---

6 Providing that "[w]ithin the workplace context, ... an expectation [of privacy] in one's place of work is based upon societal expectations that have deep roots in the history of the Amendment." (internal quotation marks and citations omitted).

7 For instance, mere access to, and even use of, the office of a co-worker "does not lead us to find an objectively reasonable expectation of privacy." <u>United States. v. Taketa</u>, 923 F.2d 665, 671 (9th Cir. 1991). Even though the defendant "had access to and control of the print shop operations, his rights did not include any expectation of privacy over documents which were kept at the print shop premises but over which [he] did not show an independent possessory or proprietary interest." <u>United States v. Cella</u>, 568 F.2d 1266, 1283 (9th Cir. 1977).

standing for his Fourth Amendment unlawful search claim, or even address this claim on summary judgment, Gillespie's motion on this claim is **GRANTED.**

IV.   <u>**Conclusion**</u>

Accordingly, it is **ORDERED** that Defendant Gillespie's motion for summary judgment with regard to Pruitt's Fourth Amendment Section 1983 claims (Docs. 17-20) is **GRANTED** as to Pruitt's claims for false arrest, malicious prosecution and unlawful search.

A Final Judgment consistent with the terms of this Order shall be entered by separate document as required by Rule 58 of the <u>Federal Rules of Civil Procedure.</u>

**DONE** and **ORDERED** this the **3**[rd] day of **February 2015.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**